# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| **IN RE:  DOXYCYCLINE CASES** | **LEAD CASE: 16-DX-27240**<br>**END-PAYER CASE: 16-DX-27242** |
| **THIS DOCUMENT RELATES TO:** | |
| ***ALL END-PAYER ACTIONS*** | **JURY TRIAL DEMANDED** |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; DETECTIVES ENDOWMENT ASSOCIATION OF THE CITY OF NEW YORK; INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 30 BENEFITS FUND; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; SELF-INSURED SCHOOLS OF CALIFORNIA; UFCW LOCAL 1500 WELFARE FUND; UNITE HERE HEALTH; OTTIS McCRARY; and VALERIE VELARDI, on behalf of themselves and all others similarly situated, | **END-PAYER PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| ACTAVIS HOLDCO U.S., INC.; ACTAVIS PHARMA, INC.; HERITAGE PHARMACEUTICALS, INC.; MAYNE PHARMA INC.; MUTUAL PHARMACEUTICAL COMPANY, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; and WEST-WARD PHARMACEUTICALS CORP., | |
| Defendants. | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## <u>**TABLE OF CONTENTS**</u>

I.      NATURE OF THE ACTION ............................................................................ 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS............................. 5

III.    JURISDICTION AND VENUE ................................................................... 11

IV.     PLAINTIFFS ............................................................................................... 12

V.      DEFENDANTS ........................................................................................... 19

VI.     CO-CONSPIRATORS.................................................................................. 23

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ............... 23

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY............................ 24

        A.    Generic Drugs Are Commodity Products ..................................................24

        B.    Pricing in the U.S. Prescription Drug Industry .......................................27

IX.     THE GENERIC DOXYCYCLINE CONSPIRACY ....................................... 30

        A.    Generic Doxycycline Price Increases .......................................................30

        B.    Congressional Responses to Generic Drug Price Increases.....................46

        C.    The Generic Doxycycline Market.............................................................47

        D.    Activities with Respect to the Generic Doxycycline Conspiracy............49

        E.    Par Is Implicated in the Doxycycline Conspiracy ................................... 52

        F.    Opportunities to Conspire .......................................................................53

        G.    Defendants' Concerted Efforts to Increase Prices for Generic Doxycycline
              Yielded Supracompetitive Profits .........................................................69

        H.    Factors Increasing the Market's Susceptibility to Collusion ...................71

              1.    Industry Concentration.................................................................. 71

              2.    Barriers to Entry ........................................................................... 72

              3.    Demand Inelasticity ...................................................................... 73

              4.    Lack of Substitutes........................................................................ 74

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    5.    Standardized Product with High Degree of Interchangeability ................... 75

    6.    Inter-Competitor Contacts and Communications ......................................... 76

X.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ........... 83

   A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did
         Not and Could Not Discover Defendants' Unlawful Conspiracy ............................ 83

   B.    Fraudulent Concealment Tolled the Statutes of Limitations .................................. 86

         1.    Active Concealment of the Conspiracy ........................................................ 87

         2.    Plaintiffs Exercised Reasonable Diligence ................................................... 89

XI.    CONTINUING VIOLATIONS ........................................................................................ 90

XII.    DEFENDANTS' ANTITRUST VIOLATIONS ............................................................. 90

XIII.    CLASS ACTION ALLEGATIONS ................................................................................. 92

XIV.    CAUSES OF ACTION ..................................................................................................... 96

   FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act
   (on behalf of Plaintiffs and the Nationwide Class) ............................................................. 96

   SECOND COUNT:  Violation of State Antitrust Statutes (on behalf of
   Plaintiffs and the Damages Class) ...................................................................................... 98

   THIRD COUNT:  Violation of State Consumer Protection Statutes
   (on behalf of Plaintiffs and the Damages Class) ............................................................... 120

   FOURTH COUNT:  Unjust Enrichment (on behalf of Plaintiffs
   and the Damages Class) ..................................................................................................... 156

XV.    PRAYER FOR RELIEF ................................................................................................. 180

XVI.    JURY DEMAND ............................................................................................................ 182

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.  NATURE OF THE ACTION

1.    This suit brings claims on behalf of indirect purchasers of generic Doxycycline ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Doxycycline.[1]

2.    Doxycycline is a broad spectrum antibiotic that entered the market in 1985 and is used in treating humans and animals. It is used to treat bacterial pneumonia, acne, chlamydia infections, *Clostridium difficile* colitis, early Lyme disease, cholera and syphilis, as well as malaria when used in conjunction with quinine. Doxycycline is on World Health Organization's ("WHO") list of essential medicines.[2]

3.    For years, competition among sellers of generic Doxycycline kept prices stable, at low levels. But starting in November of 2012, Defendants, who dominate the market for Doxycycline, abruptly and inexplicably raised prices. For example, over the course of a year the average market price for a bottle of 500 100 mg tablets of Doxycycline increased 8,281%. The U.S. Government Accountability Office ("GAO") identified Doxycycline as having "experienced an extraordinary price increase."[3]

---

[1] As used herein, the term "Doxycycline" will refer to generic Doxycycline Hyclate, including regular release capsules (50 or 100mg) and tablets (100mg), and the delayed release ("Doxy DR") version of Doxycycline Hyclate taken in the form of a tablet (75, 100, and 150mg), unless otherwise indicated.

[2] *See* WHO website, *available at* http://apps.who.int/medicinedocs/en/d/Jh2922e/2.5.8.html#Jh2922e.2.5.8.

[3] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* http://www.gao.gov/products/GAO-16-706

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROECTIVE ORDER

4.     Defendants' unlawful and anticompetitive conduct in the Doxycycline market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.     The price increases imposed by Defendant manufacturers of generic Doxycycline cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.   Instead, the significant increases in the prices of Doxycycline were the result of an illegal agreement among Defendants to fix prices.

6.     At least two individuals have admitted as much.  Two executives of Defendant Heritage Pharmaceuticals Inc. ("Heritage") have entered pleas of guilty to federal charges of price-fixing relating to Doxycycline.

7.     The market for Doxycycline was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.   Because Doxycycline is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Doxycycline products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. They are therefore interchangeable commodity products. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

8.     Because purchasers choose whose Doxycycline product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

9.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Doxycycline prices and allocate markets and customers for Doxycycline.  As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association (now the Healthcare Distribution alliance) ("HDA"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

10.     Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Doxycycline—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

11.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage relating to the sale of Doxycycline Hyclate, as well as another generic drug, Glyburide.  And DOJ has made clear that its "investigation is ongoing"[4] and that the evidence uncovered during the course of its investigation into those drugs also

---

[4] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[5]

12.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond… We're learning new things every day."[6] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[7]

13.     Generic Doxycycline—and the companies that manufacture it—are among the principal targets of these ongoing investigations.  As noted above, two executives of Defendant Heritage have pled guilty to price-fixing relating to the sale of Doxycycline.  And as discussed below, other Defendants named here have received criminal subpoenas in connection with DOJ investigation: Actavis Holdco U.S., Inc. (whose former parent Allergan plc received a subpoena regarding its Actavis Generics business prior to the sale of the same to Teva); Par Pharmaceutical, Inc. ("Par"); Sun Pharmaceutical Industries, Inc.; Mayne Pharma Inc. ("Mayne"), and Mylan Pharmaceuticals, Inc.  Indeed, Par, Mylan Pharmaceuticals, Inc. and Mayne have all admitted that one specific topic of the subpoenas is Doxycycline. Likewise, Heritage, Mylan Pharmaceuticals, Inc. and Mayne are all named defendants in a civil antitrust

---

[5] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[6] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices

[7] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

action brought by the Connecticut AG and other state attorneys general described below with respect to Doxy DR. As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more for generic Doxycycline than they would have paid in a competitive market.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Doxycycline products manufactured by any Defendant, other than for resale, from November 1, 2012 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Doxycycline products manufactured by any Defendant, other than for resale, from November 1, 2012 to the present.

## II.     ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit.

16.     On December 12 and 13, 2016, DOJ filed criminal informations against Jeffrey Glazer ("Glazer") (Chief Executive Officer ("CEO")) and Jason Malek ("Malek") (President) of Heritage. The criminal informations accuse both men of conspiring with unidentified co-conspirators to "knowingly enter[] into and engag[e] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products,

including Doxycycline Hyclate, the primary purpose of which was to allocate customers, rig

bids, and fix and maintain prices of Doxycycline Hyclate sold in the United States."[8]

17.   A press release issued by DOJ in conjunction with these filings stated:

> Millions of Americans rely on prescription medications to treat acute and chronic health conditions. By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines, said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division. "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion.

> Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law, said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division. It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law.[9]

18.   On January 9, 2017, Glazer and Malek pled guilty to felony charges that they

conspired with competitors to manipulate prices and allocate customers for Doxycycline. Glazer

admitted that:

> [he] participated in a conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products including Doxycycline Hyclate, the primary purpose of which was to allocate customers, rig bids and fix and maintain prices of Doxycycline Hyclate sold in the United States in furtherance of the conspiracy.

---

[8] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[9] DOJ Press Release (dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendant and his co-conspirators, including individuals that the defendant supervised at his company and those he reported to at his company's parent, engaged in discussions and attended meetings with the co-conspirators involved in the production and sale of Doxycycline Hyclate. During such discussions and meetings, agreements were reached to allocate customers, rig bids and fix and maintain the prices of Doxycycline Hyclate sold in the United States.[10]

19.     Malek admitted substantially the same facts.[11]

20.     As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[12]

21.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[13]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[14]

22.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig.*, No.

---

[10] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id*. at 22:4-11 (admitting facts).

[11] Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id*. at 21:23-22:6 (admitting facts).

[12] *See, e.g.,* Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg,* Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

[13] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[14] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[15]

23.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage; Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne; Mylan Pharmaceuticals, Inc; Par Pharmaceutical, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus"). And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[16]

24.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal

---

[15] *Id.*

[16] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 194.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[17]

25.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[18]

26.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[19]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[20]

27.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the

---

[17] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

[18] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual,* Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf

[19] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says,"* mLex (Feb. 21, 2017).

[20] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download

9

AGs of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation. [21]  Although the States' present complaint focuses on two drugs (Doxy DR and Glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[22]

28.   The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[23]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[24]

29.   The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the

---

[21] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

[22] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[23] Mark Pazniokus, *How a small-state AG's office plays in the big leagues,* CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

[24] State AG Complaint ¶ 7.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[25] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that in light of all of the evidence described above, the large and unprecedented price increases for generic Doxycycline cannot be explained by normal, competitive market forces. The explanation is collusion.

### III.   JURISDICTION AND VENUE

30.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

31.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

32.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

33.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce

---

[25] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[26]

34.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Doxycycline throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.     PLAINTIFFS

35.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.  District Council 37 (the "Union") is New York City's largest public employee union.  The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers.  Members covered by DC

---

[26] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.  DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Doxycycline prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, Wisconsin, and Puerto Rico, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

36.    Plaintiff Detectives Endowment Association of the City of New York ("DEA") is the second largest labor union representing police officers of the New York City Police Department.  The DEA was founded in 1917 to represent active and retired detectives of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

New York City Police Department.  The DEA represents 5,500 active and over 12,400 retired New York City Police Detectives who reside in numerous locations in the United States.  The DEA has its principal place of business in New York, New York.  During the Class Period, the DEA indirectly purchased and paid for some or all of the purchase price for one or more generic Doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Missouri,  Montana, Nevada, New Jersey, New Hampshire, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, Wisconsin and Virgin Islands thereby suffering injury to its business and property. During the Class Period, the DEA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the DEA was injured in its business or property by reason of the violations of law alleged herein. The DEA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

37.    Plaintiff International Union of Operating Engineers Local 30 Benefits Fund ("IUOE 30") is a local union that has served the interests of operating engineers and facilities maintenance workers for over a century. It is headquartered in Whitestone, New York. It provides health care, retirement and other benefits to over 4,070 individuals who reside in numerous locations in the United States through a not-for-profit trust fund. During the Class Period, IUOE 30 indirectly purchased and paid for some or all of the purchase price for one or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

more generic Doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Connecticut, Illinois, New Jersey, New York, North Dakota, and Pennsylvania, thereby suffering injury to its business and property. During the Class Period, IUOE 30 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Plaintiff IUOE 30 was injured in its business or property by reason of the violations of law alleged herein. IUOE 30 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in all fifty states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

39.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members. It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Doxycycline Hyclate prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Alabama, Alaska, Arkansas, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin and Wyoming thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

40.     Plaintiff UFCW Local 1500 Welfare Fund ("Local 1500") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

11590.  Local 1500 provides nearly 23,000 plan participants with health and welfare benefits and, with 15,000 members, is the largest grocery union in New York.  During the Class Period, Local 1500 indirectly purchased and paid for some or all of the purchase price for one or more generic Doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, Connecticut, Florida, Michigan, New Jersey, New York, Pennsylvania, and South Carolina. During the Class Period, Local 1500 purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff Local 1500 was injured in its business or property by reason of the violations of law alleged herein. Local 1500 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

41.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Washington, D.C.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

42.     Plaintiff Ottis McCrary ("McCrary") is an individual and resident of Stevenson, Alabama.   During the Class Period, McCrary indirectly purchased generic doxycycline manufactured by the Defendants.  He made the purchase of doxycycline in Alabama for his personal use at its full retail price and was not reimbursed for his purchase, thereby suffering injury to his property. During the Class Period, McCrary paid more for generic doxycycline than he would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for doxycycline.  As a result of the alleged conspiracy, Plaintiff McCrary was injured by reason of the violations of law alleged herein. McCrary intends to continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

43.     Plaintiff Valerie Velardi ("Velardi") is an individual and resident of San Francisco, California. During the Class Period, Velardi indirectly purchased generic doxycycline manufactured by the Defendants.  She made her purchases of doxycycline in California for her personal use at its full retail price and was not reimbursed for her purchase, thereby suffering injury to her property.  During the Class Period, Velardi paid more for generic doxycycline than

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

she would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for doxycycline.  As a result of the alleged conspiracy, Plaintiff Velardi was injured by reason of the violations of law alleged herein. Velardi intends to continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.   DEFENDANTS

### Actavis Defendants

44.    Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceutical USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others.  Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva Pharmaceutical USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

45.    Defendant Actavis Pharma, Inc. ("Actavis Pharma") is Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic drugs, including

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Doxycycline. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

46.     Unless addressed individually, Actavis Holdco and Actavis Pharma are collectively referred to herein as "Actavis."   During the Class Period, Actavis sold generic Doxycycline in this District and other locations in the United States.

**Heritage**

47.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, India. During the Class Period, Heritage sold generic Doxycycline to customers in this District and other locations in the United States.

**Mayne**

48.     Defendant Mayne Pharma Inc. ("Mayne") is a Delaware corporation that has its principal place of business in Raleigh, North Carolina. Mayne is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Mayne sold generic Doxycycline to customers in this District and other locations in the United States.

**Mylan Defendants**

49.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

50.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

51.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class Period, Mylan sold generic Doxycycline to customers in this District and other locations in the United States.

**Par**

52.     Defendant Par Pharmaceutical Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Par is a wholly-owned subsidiary of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. In August 2014, Endo acquired DAVA Pharmaceuticals, Inc. ("DAVA"). On information and belief, Par sold Doxycycline labeled as being made by DAVA thereafter.[27] In September 2015, Endo acquired Par. At the time of that acquisition, Endo had a separate subsidiary named Qualitest Pharmaceuticals ("Qualitest") that it had acquired in 2010. On information and belief, Qualitest was selling Doxycycline at the time it was acquired by Endo. As stated in Endo's 2016 Form 10-K filed with the Securities & Exchange Commission ("SEC"): "[t]he Company's [Endo's] U.S. Generic Pharmaceuticals segment, which was formed through a series of acquisitions including Par, Generics International (US Parent), Inc. (formerly

---

[27] Materials on Par's website suggest that Par may have sold Doxycycline manufactured by DAVA at least as early as January of 2014, even before it completed the acquisition. *See* https://www.parpharm.com/products/assets/pdf/Doxycycline-Hyclate-Capsules.pdf.

21

doing business as Qualitest Pharmaceuticals (Qualitest)), Boca Pharmacal LLC (Boca) and DAVA Pharmaceuticals, Inc. (DAVA), now collectively doing business as Par Pharmaceutical, is the fourth largest U.S. generics company based on market share."[28] Par is thus the successor in interest to both DAVA and Qualitest.  Unless addressed individually, Endo, Par, Qualitest and Dava are collectively referred to herein as "Par."  During the Class Period, Par sold generic Doxycycline to customers in this District and other locations in the United States.

**Sun Defendants**

53.    Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceuticals USA, Inc.  In late 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, PA.  Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia.  URL was registered with the Pennsylvania Department of State as a foreign corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual.

54.    Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA.  It is a wholly-owned subsidiary of SPII.  Since April 29, 2015 (the day after Mutual and URL merged) Mutual has been registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products, including generic Doxycycline, sold and distributed

---

[28] Endo 2016 Form 10-K, *available at* http://annualreportendo.com/pdf/Endo-2016-Form-10-K.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

55.     Unless addressed individually, SPII, URL and Mutual are collectively referred to herein as "Sun."  During the Class Period, Sun sold generic Doxycycline to customers in this District and other locations in the United States.

**West-Ward**

56.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company. During the Class Period, West-Ward sold generic Doxycycline to customers in this District and other locations in the United States.

## VI.   CO-CONSPIRATORS

57.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

58.     During the Class Period, Defendants sold and distributed generic Doxycycline in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

59.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Doxycycline, took place within the United States and has had, and was intended to

have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

60.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Doxycycline to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

### VIII.     BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products

61.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[29] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[30]

62.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[31] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[32]

---

[29] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf
[30] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341
[31] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G
[32] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

63.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[33]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[34] Mature generic markets—like that of Doxycycline—typically have several manufacturers that compete for sales, hence keeping prices in check.

64.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[35]

65.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

---

[33] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800
[34] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf
[35] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

66.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

67.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[36]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

68.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.   Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[36] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

69.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.   A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[37]

70.     When there are multiple generic manufacturers in an established generic market— as with generic Doxycycline—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing in the U.S. Prescription Drug Industry**

71.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies

---

[37] GAO Report at 23.

27

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

72.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[38]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[39]  In effect, NADAC is "a single national average."[40]  Thus, NADAC is one way to track general price trends in the marketplace.

73.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific.  Drug manufacturers typically report benchmarks—like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list

---

[38] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[39] *Id.* at 15.

[40] *Id.*

price.  Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[41]

74.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC.  The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

75.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

76.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A

---

[41] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing.  NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

77.    Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.    THE GENERIC DOXYCYCLINE CONSPIRACY

### A.    Generic Doxycycline Price Increases

78.    For generic Doxycycline, the pattern of huge, collusive price increases – which so far has resulted in two guilty pleas to criminal price-fixing – started in the fall of 2012.

79.    Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, in his testimony at the November 2014 United States Senate hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"), presented the following chart showing the sudden increase in West-Ward's AWP for generic Doxycycline from under $2.50 for a day of therapy to over $11 by January 2013:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



80.    Similarly, Senator Bernie Sanders ("Sanders") and Representative Elijah Cummings ("Cummings") noted huge increases in the price of generic Doxycycline in letters to generic drug manufacturers sent in October of 2014 (October Letters"):

| Drug | SKU | Average Market Price October 2013 | Average Market Price April 2014 | Cost Increase | Average Percentage Increase |
|------|-----|-----------------------------------|----------------------------------|---------------|------------------------------|
| Doxycycline Hyclate | bottle of 50, 100mg capsules | $4 | $191 | $187 | 5,025% |
| Doxycycline Hyclate | bottle of 50, 100mg tablets | $3 | $191 | $187 | 4,986% |
| Doxycycline Hyclate | bottle of 50, 50mg capsules | $3 | $70 | $67 | 2,191% |
| Doxycycline Hyclate | bottle of 500, 100mg capsules | $27 | $1,849 | $1,822 | 7,105% |
| Doxycycline Hyclate | bottle of 500, 100mg tablets | $20 | $1,849 | $1,829 | 8,281% |

FILED UNDER SEAL
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

81.    The NADAC data for 50 mg and 100 mg of generic Doxycycline capsules manufactured and/or distributed by Defendants Actavis, West-Ward, Sun, and Mylan and by Par (via Qualitest and/or DAVA) reveal a similar pattern:



82.    The same is true with respect to 75 mg and 100 mg Doxy DR tablets, also as shown through NADAC data:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





83.     Such dramatic, across-the-board price increases are consistent with DOJ's allegations of collusion, which thus far have resulted in two guilty pleas, as well as the allegations of the State AGs and Plaintiffs herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

84.     The average effective prices (rounded to the nearest cent) for the Doxycycline

Hyclate products ███████████████████████████████████████████████████████

████████████ ██████[42]

85.     The average effective prices for ███████████████████████████████

██████████████████████████████████████

| Product | Price Oct. 2012 | Hike Date | Post-Hike Price | Percentage Increase |
|---------|-----------------|-----------|-----------------|---------------------|
| CAP 50 MG | | | | |
| CAP 100 MG | | | | |
| TAB 100 MG | | | | |

████████████████████████████████████████████████████████████████████

████████████████████████████████████

| Product | Peak Price Date | Peak Price | Percentage Increase |
|---------|-----------------|------------|---------------------|
| CAP 50 MG | | | |
| CAP 100 MG | | | |
| TAB 100 MG | | | |

_____

[42] Plaintiffs calculate Defendants' effective prices based on IMS Health's National
Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market,
measuring sales at actual transaction prices[.]"  IMS Institute for Healthcare Informatics, HSRN
Data Brief: National Sales Perspectives at 1, *available at*
https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.  Effective prices
are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to
the nearest cent.  However, percentage increases are calculated based on the more precisely
calculated price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

██████████████████████████████████████████████ ██

████████████████████████████████████████████████

████

| Product | Price Oct. 2012 | Price Apr. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| CAP 50 MG | | | |
| CAP 100 MG | | | |
| TAB 100 MG | | | |

86. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

| Product | Price Oct. 2012 | Hike Date | Post-Hike Price | Percentage Increase |
|---------|-----------------|-----------|-----------------|---------------------|
| CAP 50 MG | | | | |
| CAP 100 MG | | | | |
| TAB 100 MG | | | | |

████████████████████████████████████████████████

██████████████████████████

| Product | Peak Price Date | Peak Price | Percentage Increase |
|---------|-----------------|------------|---------------------|
| CAP 50 MG | | | |
| CAP 100 MG | | | |
| TAB 100 MG | | | |

35

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

| Product | Price Oct. 2012 | Price Apr. 2016 | Percentage Increase |
|---|---|---|---|
| CAP 50 MG | | | |
| CAP 100 MG | | | |
| TAB 100 MG | | | |

87.  ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

88.  ████████████████████████████████████████████

███████████████████████████████████████████████████:

| Product | Price Oct. 2012 | Hike Date | Post-Hike Price | Percentage Increase |
|---|---|---|---|---|
| CAP 50 MG | | | | |
| CAP 100 MG | | | | |
| TAB 100 MG | | | | |

███████████████████████████████████████████████████

███████████████████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 50 MG | | | |
| CAP 100 MG | | | |
| TAB 100 MG | | | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

████████████████████████████  ████████████████

████████████████████████████████████████████████

██████████████████

| Product | Price Oct. 2012 | Price Apr. 2016 | Percentage Increase |
|---|---|---|---|
| CAP 50 MG | ████████ | ████████ | ████████ |
| CAP 100 MG | ████████ | ████████ | ████████ |
| TAB 100 MG | ████████ | ████████ | ████████ |

89.    Remarkably, Sun, West-Ward and Actavis all raised the list price (WAC) on their

50 mg capsules by approximately 2000% to identical levels over a two-week period:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 50 mg. cap, 50 ct. | West-Ward | 00143-3141-50 | $0.09 | $1.80 | 21-Jan-13 | 1,903% |
| 50 mg. cap, 50 ct. | Actavis | 00591-5535-50 | $0.10 | $1.80 | 1-Feb-13 | 1,782% |
| 50 mg. cap, 50 ct. | Sun | 53489-0118-02 | $0.09 | $1.80 | 5-Feb-13 | 1,953% |
| 50 mg. cap, 500 ct. | Sun | 53489-0118-05 | $0.08 | $1.80 | 5-Feb-13 | 2,181% |

90.    In the same two-week period, the same Defendants increased the list prices on

their 100 mg capsules and 100 mg tablets by even more:

37

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. cap, 50 ct. | West Ward | 00143-3142-50 | $0.10 | $4.43 | 21-Jan-13 | 4,326% |
| 100 mg. cap, 50 ct. | Actavis | 00591-5440-50 | $0.10 | $2.74 | 1-Feb-13 | 2,515% |
| 100 mg. cap, 50 ct. | Sun | 53489-0119-02 | $0.10 | $4.92 | 5-Feb-13 | 4,847% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. cap, 500 ct. | West Ward | 00143-3142-05 | $0.10 | $4.43 | 21-Jan-13 | 4,370% |
| 100 mg. cap, 500 ct. | Actavis | 00591-5440-05 | $0.10 | $2.74 | 1-Feb-13 | 2,663% |
| 100 mg. cap, 500 ct. | Sun | 53489-0119-05 | $0.06 | $4.92 | 5-Feb-13 | 7,844% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. tab, 50 ct. | Actavis | 00591-5553-50 | $0.10 | $2.74 | 1-Feb-13 | 2,515% |
| 100 mg. tab, 50 ct. | Sun | 53489-0120-02 | $0.09 | $4.92 | 5-Feb-13 | 5,631% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. tab, 500 ct. | Actavis | 00591-5553-05 | $0.10 | $2.74 | 1-Feb-13 | 2,663% |
| 100 mg. tab, 500 ct. | Sun | 53489-0120-05 | $0.08 | $4.92 | 5-Feb-13 | 6,268% |

91.     Defendants' price hikes are further illustrated in the following charts showing ███

██████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

92.   The following chart shows ███████████████████████

████████████████████████████████████████████████████████



93.   These charts are offered as examples. As noted above, the price increases affected a variety of dosages of Doxycycline in both capsule and tablet form.

94.   Price hikes are also demonstrated by changes in WAC for Doxycycline. Even though their WAC price changes represented about a twenty fold increase from previous WACs, Actavis, West-Ward, and Sun all raised the WACs on the 50 mg. capsules to identical benchmark prices over a two-week period:[43]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 50 mg. cap, 50 ct. | West-Ward | 00143-3141-50 | $0.09 | $1.80 | 21-Jan-13 | 1,903% |

---

[43] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 50 mg. cap, 50 ct. | Actavis | 00591-5535-50 | $0.10 | $1.80 | 1-Feb-13 | 1,782% |
| 50 mg. cap, 50 ct. | Sun | 53489-0118-02 | $0.09 | $1.80 | 5-Feb-13 | 1,953% |
| 50 mg. cap, 500 ct. | Sun | 53489-0118-05 | $0.08 | $1.80 | 5-Feb-13 | 2,181% |

95.     In the same two-week period, Defendants also increased their WACs on their regular release 100 mg. capsules and 100 mg tablets by as much as 7,844%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. cap, 50 ct. | West Ward | 00143-3142-50 | $0.10 | $4.43 | 21-Jan-13 | 4,326% |
| 100 mg. cap, 50 ct. | Actavis | 00591-5440-50 | $0.10 | $2.74 | 1-Feb-13 | 2,515% |
| 100 mg. cap, 50 ct. | Sun | 53489-0119-02 | $0.10 | $4.92 | 5-Feb-13 | 4,847% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. cap, 500 ct. | West Ward | 00143-3142-05 | $0.10 | $4.43 | 21-Jan-13 | 4,370% |
| 100 mg. cap, 500 ct. | Actavis | 00591-5440-05 | $0.10 | $2.74 | 1-Feb-13 | 2,663% |
| 100 mg. cap, 500 ct. | Sun | 53489-0119-05 | $0.06 | $4.92 | 5-Feb-13 | 7,844% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg. tab, 50 ct. | Actavis | 00591-5553-50 | $0.10 | $2.74 | 1-Feb-13 | 2,515% |
| 100 mg. tab, 50 ct. | Sun | 53489-0120-02 | $0.09 | $4.92 | 5-Feb-13 | 5,631% |

41

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 100 mg. tab, 500 ct. | Actavis | 00591-5553-05 | $0.10 | $2.74 | 1-Feb-13 | 2,663% |
| 100 mg. tab, 500 ct. | Sun | 53489-0120-05 | $0.08 | $4.92 | 5-Feb-13 | 6,268% |

96.     Par entered the Doxycycline market (through DAVA) after the Class period began.  Instead of competing on price in an effort to gain market share, Par priced at a supracompetitive level comparable to the other Defendants.  Even today its prices are far above competitive, pre-conspiracy prices.

97.     There are no legal justifications for these abrupt and dramatic increases in prices.

98.     Input costs do not explain these price hikes. Sun reported in a May 28, 2012 earnings call that "[m]aterial cost, as a percentage of the net sales is 18.5% which is lower as compared to the previous year."[44] Likewise, in a November 14, 2013 earnings call, Sun reported that second quarter costs were "in-line with Q2 last year."[45] Hikma, the parent of West-Ward, reported in 2013 that Doxycycline sales reflected "exceptional profitability" and "generated exceptionally strong cash flows."[46]

99.     Reported shortages affecting some Doxycycline products also cannot explain the incredible price increases.

100.    The American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins did not report any shortages of Actavis's 100 mg tablets.

---

[44] Sun Press Release, *available at* http://www.sunpharma.com/Media/Press-Releases/FY13%20Q4%20Earnings%20Call%20Transcript.pdf.

[45] Sun Press Release, *available at* http://www.sunpharma.com/Media/Press-Releases/FY14%20Q2%20Earnings%20Call%20Transcript(1).pdf.

[46] Hikma Interim Financial Results, *available at* http://www.hikma.com/content/dam/hikma/corporate/investors/Financial%20docs/2013%20Interim%20results.pdf.downloadasset.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

101.    In December 2012, May 2013, July 2013, January 2014, March 2014, June 2014, and July 2014, ASHP reported shortages of Actavis's 50 mg and 100 mg capsules.[47]  By January 14, 2015, however, ASHP described the Doxycycline capsule and tablet shortages as "resolved,"[48] and on May 18, 2015, it listed Actavis's 50 mg and 100 mg capsules as "available."[49]

102.    Importantly, Actavis told ASHP that the reason for its purported capsule shortages was "supply and demand,"[50] suggesting that the "shortages" may have been voluntarily cutbacks rather than true shortages.

103.    Indeed, despite its reported capsule "shortages," Actavis's 2013 capsule sales actually increased. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████    That sales increased during the purported "shortage" and decreased when drugs were available undermines any claim that shortages caused Actavis's price increases.

104.    In December 2012, May 2013, and July 2013, ASHP reported shortages of Sun's 50 mg and 100 mg capsules and 100 mg. tablets.[51]  By January of 2014, however, all three

---

[47] ASHP, Current Drug Shortage Bulletin: Doxycycline Capsules and Tablets ("Current Drug Shortage Bulletin"), December 10, 2012; May 20, 2013; July 10, 2013; January 15, 2014; March 6, 2014; June 23, 2014; and July 18, 2014, *available at* https://webbeta.archive.org/web/20130106210923/http://www.ashp.org:80/DrugShortages/Current/Bulletin.aspx?id=977.

[48] ASHP, Current Drug Shortage Bulletin (January 14, 2015), *available at* https://web-beta.archive.org/web/20150923175237/http://www.ashp.org/menu/DrugShortages/CurrentShortages/bulletin.aspx?id=431

[49] ASHP, Current Drug Shortage Bulletin (May 18, 2015), *available at* https://web%adbeta.archive.org/web/20150923175239/www.ashp.org/menu/DrugShortages/CurrentShortages/Bulletin.aspx?id=977.

[50] ASHP, Current Drug Shortage Bulletin (July 18, 2014) n.8.

[51] ASHP, Current Drug Shortage Bulletin (December 10, 2012; May 20, 2013; July 10, 2013).

43

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

products were listed as "available."[52]   According to communications with Sun (formerly Mutual), the shortages were the result of an unspecified "raw material shortage."[53]   Archived ASHP lists indicate that Sun was the only manufacturer of Doxycycline tablets and capsules to offer this excuse.  And despite its reported "shortages" in 2013, ███████████████████
█████████████████████████████████████████    ███████████████
█████████████████████████████████████████████████████
█████████████████████████   As with Actavis, then, Sun's sales somehow increased during the purported "shortage" and decreased when its drugs became available, thus undermining any claim that shortages caused Sun's price increases.

105.    ASHP reported shortages of West-Ward's 50 mg capsules and of certain package sizes of its 100 mg capsules and tablets in December of 2012.[54]   By May of 2013, all three products were reported as "available" again, although West-Ward discontinued its 20 count bottle of 100 mg capsules.[55]   Notably, ASHP reported that West Ward "could not provide a reason for the shortage."[56] ██████████████████████
███████████████████████████████████████████████████
███████████████████████████

106.    The Doxycycline price hikes caused extreme hardship to consumers. As reported on WSMV-TV of Nashville's website in March 2013:

> Many people may not recognize the name, but they have probably used it for a health problem at one point.

---

[52] ASHP, Current Drug Shortage Bulletin (January 15, 2014).

[53] ASHP, Current Drug Shortage Bulletin (July 10, 2013) n.4.

[54] ASHP, Current Drug Shortage Bulletin (December 10, 2012).

[55] ASHP, Current Drug Shortage Bulletin (May 20, 2013).

[56] ASHP, Current Drug Shortage Bulletin (December 10, 2012).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Doctors use Doxycycline to treat a wide range of issues, including everything from acne to Lyme disease, anthrax exposure and even heartworm in our pets.

However, the once cheap and effective drug has now dramatically gone up in price, and that has health professionals concerned.

Hospitals like Vanderbilt University Medical Center keep Doxycycline in stock, but some folks worry the cure for their ailment could now be financially out of reach.

"It's a change that occurred overnight," said Vanderbilt pharmacy manager Michael O'Neil.

Not long ago, the pharmacy at Vanderbilt's hospital could purchase a 50-count bottle of 100 mg Doxycycline tablets for $10, but now the same bottle costs a staggering $250.

"That's concerning to us, both as citizens and practitioners, when you see a huge increase like this in a price of a drug," O'Neil said.

Vanderbilt keeps thousands of Doxycycline pills on hand in the event of a bioterrorist attack, like anthrax, and O'Neil said replacing expired pills is prohibitive.

"This one is just hurting us when we need to replace the medication," he said.

But it's the most vulnerable who are in the most jeopardy. For a pet, a heartworm diagnosis can be a death sentence without Doxycycline.

Veterinarian Dr. Joshua Vaughn of the Columbia Hospital for Animals is already seeing the tragic results.

"We had one patient who we diagnosed with heartworm. We recommended heartworm treatment, but when they saw the total dollar amount, they elected not to treat the dog at all," Vaughn said.

While manufacturers say they are having problems with raw supply, many in the medical community see greed as an overriding factor.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Vaughn said he wrote a recent prescription for Doxycycline that cost $77. This week, the price increased to nearly $3,000.[57]

107.    Around seven months after the price of Doxycycline skyrocketed in January 2013, Defendant West-Ward's parent company Hikma raised guidance for the drug Doxycycline from $200 million to $230 million—a show of confidence, and perhaps a signal to co-conspirators, "that Doxycycline prices will remain high."[58]

### B.    Congressional Responses to Generic Drug Price Increases

108.    These price hikes, among others, came to the attention of the United States Congress. It raised concerns about the alarming price spikes for numerous generic pharmaceuticals.   These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

109.    In the Fall of 2014, Senator Sanders and Representative Cummings requested information from manufacturers of ten drugs that had experienced extraordinary price increases. Six of those drugs are now the subject of complaints in this MDL.[59]  The two sent letters to various generic drug manufacturers in October of 2014, asking about these price increases. Letters raising issues as to the pricing of Doxycycline were sent to Actavis, Endo (the parent of Par) as well as Par itself, Mylan, West-Ward and Sun.  In November of 2014, Senator Sanders

---

[57] Alan Frio, *Sudden increase in cost of common drug concerns many* WSMV (March 12, 2013), *available at* http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concerns-many.

[58] ET Markets, *Sun Pharma shares gain on strong guidance for Doxycycline* (Aug. 23, 2013), *available at* http://articles.economictimes.indiatimes.com/2013-08-23/news/41440919_1_sun-pharmaceuticals-Doxycycline-sun-pharma-shares.

[59] Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conducted the Senate Hearing referenced above. Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[60]

110.    Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.   The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[61]

111.    In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[62]   The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[63]   And this was the case for most generics.   But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[64]   Those included Doxycycline.

### C.    The Generic Doxycycline Market

112.    Generic Doxycycline is sold throughout the United States and its territories.

---

[60] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced

[61] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf

[62] GAO Report.

[63] *Id.* at 23-25.

[64] *Id.* at 1 & Appendix III.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

113.   At all relevant times, Defendants had substantial market power with respect to generic Doxycycline.  Defendants exercised this power to maintain supracompetitive prices for Doxycycline without losing so many sales as to make the elevated price unprofitable.

114.   In the United States generic Doxycycline market, the number of meaningful competitors has dwindled, creating conditions favorable to an effective cartel. The firms that currently control most of the market are Defendants.

115.   At one point there were over 20 manufacturers of generic Doxycycline.[65] However, over the past decade, the number of generic drug manufacturers producing Doxycycline has steadily dropped. Major Pharmaceuticals, Teva, and West-Ward were among the generic manufacturers that discontinued certain Doxycycline product lines. Major Pharmaceuticals' and Teva's discontinuations occurred in or around February 2013 and May 2013, respectively.[66] West-Ward discontinued one line of Doxycycline in or around July 2013. Defendants' market share for generic Doxy DR products was nearly 100%.

116.   Defendants sold generic Doxycycline at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

117.   During the Class Period, Defendants dominated the Doxycycline market. Defendants controlled a commanding collective percentage of the generic Doxycycline market, implying a substantial amount of market power.

118.   Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Doxycycline.

---

[65]  Steve Myrick, Cost of Doxycycline Skyrockets, Vineyard Gazette (Sept. 24, 2015) https://vineyardgazette.com/news/2015/09/24/cost-Doxycycline-skyrockets.

[66]  ASHP, *formerly available at* http://www.ashp.org/menu/DrugShortages/CurrentShortages/bulletin.aspx?id=977.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### D.    Activities with Respect to the Generic Doxycycline Conspiracy

119.    Heritage began selling Doxy DR on July 2, 2013. At the time, Mylan was the only competitor for Doxy DR. Even before entering the market, Heritage contacted Mylan about refraining from price competition. On May 2, 2013, Malek of Heritage asked an executive at Heritage to set up a call between Malek and the Vice-President of Sales at Mylan. Malek was told that the Vice-President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts. On information and belief, that latter person was Jan Bell ("Bell"), who was a Senior Key Account Manager at Mylan from September of 2010 to January of 2013 and has served as Director of National Accounts at Mylan since January of 2013.[67]   On information and belief, Malek promptly contacted Bell through LinkedIn. Malek and Bell communicated by telephone on multiple occasions and continued to communicate about various drugs, including Doxy DR.[68]

120.    Similarly, beginning on or about May 8, 2013, Glazer of Heritage commenced similar discussions with another Mylan executive. That Mylan executive responded with a phone number where he could be reached in England, and the two spoke the next day.

121.    These Defendants reached an agreement to allocate market share and refrain from competing with one another for customers in the market for Doxycycline. The objective was to avoid a price war which would reduce profitability for both companies. Mylan agreed to walk

---

[67] *See* Bell LinkedIn Profile, *available at* https://www.linkedin.com/in/jan-bell-51a3135/.

[68] Malek also knew Bob Potter ("Potter"), the Senior Vice-President North America National Accounts & Channel Development at Mylan. *See* Potter LinkedIn Profile, *available at* https://www.linkedin.com/in/bob-potter-9aa11b77/.  Potter has also served as a Director of NACDS since 2010. Bloomberg Overview of NACDS, *available at* http://www.bloomberg.com/research/stocks/private/person.asp?personId=108541741&privcapId=58796213&previousCapId=93625&previousTitle=CVS%20HEALTH%20CORP.  Malek and Potter frequently attended NACDS events, such as the NACDS Store Expo held every August throughout the Class Period.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

away from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share.

122.    In February of 2014, Mayne entered the market for Doxycycline. The month before it did so, on or about January 7, its representatives had telephonic discussions with representatives of Heritage on allocating customers and thereby dividing market share.[69] After its entry, Mayne initially avoided competing for business with customers of Heritage and instead targeted customers of Mylan. In one instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the wholesaler asked Heritage to also submit a bid. Heritage declined, honoring its on-going agreement with Mylan, and provided a false, pretextual reason (inadequate supply) to the wholesaler.

123.    In March 2014, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts. This led to telephonic, e-mail and texted discussions between representatives of Mayne and Heritage over the next several months. In November of 2014, Mayne made offers to the One Stop Program of McKesson Corporation ("McKesson") (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO")) that includes Express Scripts, Kroger, and Supervalu). Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson. Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow up communications occurred in December 2014 by text

---

[69] The Director of National Accounts for Mayne at the time was Gloria Peluso-Schmid, who has held that position since November of 2012. *See* Peluso-Schmid LinkedIn Profile, *available at* https://www.linkedin.com/in/gloria-peluso-schmid-72770817. The Vice-President of Sales at Mayne and its Executive Vice-President of Generic Products are the same person: Chris Schneider, who has served in both roles since July of 2013. *See* Schneider LinkedIn Profile, *available at* https://www.linkedin.com/in/chris-schneider-77097a6.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

messaging and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

124.    The agreement resulted in elimination of price competition and higher prices for Doxycycline. When Econdisc put its business out for bid again in January 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business.   Likewise, when Heritage was requested to submit a bid by a large nationwide pharmacy chain in September of 2015, it declined to do so after learning that Mayne was the incumbent supplier. The customer and market allocation agreements described herein caused prices for Doxy DR to be higher than they would have been in a truly competitive market and prevented price erosion that might have occurred in such a market.

125.    Glazer, Malek, Heritage and Mayne knew they were acting unlawfully and endeavored to conceal their conduct. Glazer repeatedly advised Malek to destroy incriminating e-mails and not to put incriminating evidence in writing and gave similar admonitions to Heritage's sales team. Glazer, Malek and Heritage salespersons also deleted incriminating texts from their office iPhones, and a Mayne executive deleted incriminating texts from her cell phone before the data on it were imaged and produced to the Connecticut Attorney General.

**E.      Par Is Implicated in the Doxycycline Conspiracy**

126.    By April 2014 (and perhaps earlier), DAVA began to sell Doxycycline (regular release) pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals, LLC ("Chartwell").   Around this time, Endo was in discussions with DAVA to acquire it, which it did in August 2014.

127.    Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

agreement for Doxycycline.[70]   Chartwell alleged that DAVA, DAVA's President Aram Moezinia, and Endo (through its generics subsidiaries) refused to take delivery of Doxycycline shipments from Chartwell despite the fact that there was demand for Doxycycline in the market. Because Endo (through its generic subsidiaries including DAVA) refused to accept the available Doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

128.    Chartwell recognized that its supply of Doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits."[71]   But DAVA (and subsequently, Endo and Par) withheld Doxycycline supply from the market and priced Doxycycline at the supracompetitive price of its co-conspirators. Chartwell suggested a reason for Endo's economically irrational decision to withhold additional Doxycycline supply when there was ample demand in the market.   It accused DAVA and Endo (and its generic subsidiaries) of engaging in an illegal price-fixing and market allocation scheme: "Having bought DAVA, Endo implemented its withhold-and-price-gouge scheme, did virtually nothing to sell the Chartwell Entitites' Doxy, and, in collusion with its alleged 'competitors,' set Doxy's price at the **exact same** level its competitors were charging for the drug." (emphasis in original).[72]   Chartwell further alleged that "DAVA and Moezinia dedicated efforts to **withhold** [Doxycline] from the marketplace . . . to keep the overall price of Doxy high." (emphasis in original).[73]   For example, Chartwell cites to an email dated on or about July 11, 2014 where

---

[70] *See Dava Pharmaceuticals, LLC v. Chartwell Therapeutics Licensing, LLC* ("*Dava v. Chartwell*"), Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

[71] Chartwell Answer and Counterclaims, *Dava v. Chartwell*, NYSCEF Doc. No. 167 at 34 (July 29, 2016).

[72] *Id.* at 31.

[73] *Id.* at 42.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Moezinia emailed Chartwell and stated that DAVA's plan was to sell Doxycycline "slowly not to disturb pricing."[74]

129.    Chartwell sought discovery of the materials that Par and Endo have produced to DOJ and the State AGs.  Notably, the regulators' inquiries to Endo have focused on at least three drugs that Endo acquired rights to via DAVA: doxycycline hyclate, doxazosin mesylate, and methotrexate sodium.[75]  Chartwell and Endo settled their claims in November 2016.

130.    Even today, Par's prices for Doxycycline are well above the competitive prices that prevailed in the market before Defendants' conspiratorial price-hikes.

### F.    Opportunities to Conspire[76]

131.    In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

132.    As alleged by the state AGs, "the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events . . . ."[77]

133.    Defendants also met through trade associations, including the GPhA (now the Association for Accessible Medicines), which describes itself as "the nation's leading trade

---

[74] *Id.* at 47.

[75] *See infra* ¶ 194(j).

[76] The allegations included in this section pertaining to the HDMA, ECRM, MMCAP, and NACDS are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

[77] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[78] "Regular Members" of the GPhA during the Class Period included Defendants Actavis (through Teva), Heritage, Sun, and West-Ward, while DAVA Pharmaceuticals was an Associate Member.[79] Members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[80]

134.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

a.    **2012 Board of Directors**: Tony Mauro ("Mauro"), President of Mylan North America; Doug Boothe, President and CEO of Actavis, Inc.; and Glazer;

b.    **2013 Board of Directors**: Mauro; Charlie Mayr ("Mayr"), Chief Communications Officer – Global, Actavis, Inc.; and Glazer.

c.    **2014 Board of Directors**: Glazer and Mauro;

d.    **2015 Board of Directors**: Glazer; Marcie McClintic Coates ("Coates"), Vice-President & Head of Global Regulatory Affairs for Mylan; and Tony Pera ("Pera"), President of Par;

e.    **2016 Board of Directors**: Heather Bresch ("Bresch"), CEO of Mylan; Pera; Glazer; and Jim Kedrowski, Executive Vice-President of Sun.

---

[78] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership ).

[79] *See* AAM website, *available at* https://www.accessiblemeds.org/our-members.

[80] GPhA Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

135.    Representatives from Defendants attended periodic meetings held by GPhA.[81]
The following table lists some of the GPhA meetings attended by Defendants' employees:

| Meeting | Meeting Date & Location | Attendees |
|---|---|---|
| 2012 GPhA Annual Meeting Business Exposition | February 22-24, 2012 Orlando, Florida | Mylan, Par |
| 2012 GPhA Fall Technical Conference | October 1-3, 2012 Bethesda, Maryland | Actavis, Heritage, Par (and Endo Pharmaceutical), Mylan, Sun |
| 2013 GPhA Annual Meeting | February 20-22, 2013 Orlando, Florida | Actavis (Sigurdrur Olafsson, President), Heritage, Mylan (Mauro), Par (and DAVA, Endo, and Qualitest), URL Pharma, |
| 2013 GPhA CMC Workshop | June 4-5, 2013 Bethesda Maryland | Actavis, Heritage, Mylan, Par (and Endo, Qualitest), Sun |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013 Bethesda, Maryland | Actavis, Heritage, Mylan, Par (and Endo, Qualitest), Sun |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Actavis, Heritage, Mylan, Par (and DAVA, Endo, Qualitest), Sun |
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda Maryland | Actavis, Heritage, Mylan, Par (and Qualitest), Sun |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Actavis, Heritage, Mylan (Coates), Par (and Qualitest), Sun, West-Ward |
| 2015 GPhA Annual Meeting | February 9-11, 2015 Miami Beach, Florida | Actavis, Heritage, Mylan, Par, West-Ward |

[81] *See* GPhA, http://www.gphaonline.org/index.php/events/2013-annual-meeting-past-attendees; http://www.gphaonline.org/index.php/events/2014-annual-meeting-past-meeting-attendees; http://www.gphaonline.org/events/past-events/2012-gpha-fda-fall-technical-conference; http://www.gphaonline.org/events/past-events/gpha-2013-fall-technical-conference.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Meeting | Meeting Date & Location | Attendees |
|---|---|---|
| 2015 GPhA CMC Workshop | June 9-10, 2015 Bethesda, Maryland | Mylan, Par, Sun, West-Ward |

136.    The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

137.    The HDMA (now the HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[82]  HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.  HDMA members during the Class Period have included Defendants Actavis, Heritage, Par, Sun, and Mylan.

138.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.  MMCAP has been delivering pharmacy and healthcare value to members since 1985.  MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

---

[82] HDA website, About, *available at* https://www.healthcaredistribution.org/about.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

139.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program . . . In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy . . . and currently provide healthcare-related contracting to state and local government members located across the United State of America.  Total purchasers by MMCAP member facilities for all MMCAP programs exceed $1 billion annually . . . ."

140.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

141.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

142.    ████████████████████████████████████████████████
████████████████████████████████

143.    Numerous GPhA meetings are set forth in the table above.  In addition, as set forth below, meetings and events hosted by the HDMA, ECRM, NACDS, and MMCAP were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

144.    ████████████████████████████████████████████████
████████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

███  ████████████████████████████████████

███  ████  ██████  ████████  ████████  ██████  ████  ██████

██████████████████

145.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. This meeting was attended by representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Actavis**: Boyer, Olafsson, Robert Stewart, COO; Michael Baker ("Baker"), Executive Vice-President, Trade & Sales Department;

b.    **Mylan**: Joe Duda ("Duda"), President; Robert Potter, Senior Vice-President of National Accounts and Channel Development; Mauro; Jim Nesta ("Nesta"), Vice-President of Sales;

c.    **Par**: Holden; Campanelli; Michael Altamuro ("Altamuro"), Vice-President Marketing & Business Analytics; Rennee Kenny ("Kenny"), Senior Advisor, Generic Sales;

d.    **(Par) Endo:** Scott Littlefield ("Littlefield"), Trade Director; and Brent Bumpas ("Bumpas"), National Account Director – Trade;

e.    **Sun:** GP Singh Sachdeva ("Sachdeva"), President of Sun Pharmaceuticals, USA;

f.    **(Sun) URL:** Bill Everett, National Trade Account Manager.

146.    On June 2-5, 2013, HDMA held its 2013 Business Leadership Conference ("BLC") in Orlando, Florida. This meeting was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

a.    **Actavis**: Boyer, Marc Falkin (Falkin"), Vice-President of Purchasing; Barrett; Anthony Giannone ("Giannone"), National Accounts Director;

59

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

b.  **Heritage**: O'Mara; Sather;

c.  **Mylan**: Janet Bell, National Accounts Director; Duda; Edgar Escoto ("Escoto"), National Accounts Director; Kevin McElfresh ("McElfrisch"), Executive Director, National Accounts; Nesta; Robert O'Neill ("O'Neill"), Vice-President; Sean Reilly ("Reilly"), Key Account Manager; John Shane, Director of National Trade Accounts; Gary Tighe ("Tighe"), National Accounts Director; Lance Wyatt ("Wyatt"), National Accounts Director;

d.  **Par**: Holden; Sandra Bayer ("Bayer"), National Accounts Manager; Peter Gargiulo ("Gargiulo"), Director, National Accounts; Christopher Neurohr, Director, National Accounts;

e.  **(Par) Endo:** John Bullock, National Accounts Director;

f.  **Sun**: Scott Littlefield, National Account Director; Daniel Schober, Associate Vice- President, Trade Sales;

g.  **(Sun) Mutual**:  David Moody, CEO of Mutual; David Simoneaux, Marketing Coordinator of Mutual; and

h.  **West-Ward**: Mark Boudreau, Executive Director of National Sales; Paul Kersten, Vice-President, Sales & Marketing; Paul Kersten, Vice-President for Sales & Marketing; Neal Gervais, National Account Director; John Kline, National Account Director; and Joseph Ruhmel, National Account Director.

147.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo ("TSE") at the Sands Expo Convention Center in Las Vegas, Nevada. This TSE was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a.    **Actavis**: Baker; Boyer; Napolean Clark ("Clark"), Vice-President of Marketing; Dorsey; Falkin; Giannone; Megan Gorman, Senior Marketing Manager; Maureen Meehan, Director of National Accounts; Cindy Stevens ("Stevens"), Director of National Accounts;

b.    **Heritage**: Allen Dunehew, President & CEO; Edelson; Glazer; Malek; O'Mara; Sather; Gina Gramuglia ("Gramuglia"), Commercial Operations;

c.    **Mylan**: Nesta; Mike Aigner ("Aigner"), Director, National Accounts; Duda; McElfresh; O'Neill; Robert Potter ("Potter"), Senior Vice-President, National Accounts & Channel Development; Wyatt; Matt Cestra, Senior Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Escoto; Stephen Krinke, National Accounts Manager; Damon Pullman, West Regional Account Manager; Reilly;

d.    **Par**: Holden; Altamuro; Renee Kenney ("Kenney"), Senior Advisor Generic Sales; O'Connor; Rick Guillory ("Guillory"), Vice-President of National Accounts; Gerald Burton, Vice-President of National Account;

e.    **(Par) DAVA:** Rich Franchi, Vice President, Sales; Kim Rothofsky, Senior Director, Trade Relations;

f.    **(Par) Endo:** Scott Littlefield, Trade Director; Bumpas;

g.    **(Par) Qualitest:** Pefley; Charles Probst, Vice President; Kelly Bachmeier, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; James Burnett, National Accounts Manager; Walter Busbee, Director National Accounts; Lori Minnihan, Associate Director, Trade Pricing Operations; Spike Pannell, National Account Manager;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

h.  **Sun:** William Everett, National Trade Account Manager; Wayne Fallis, Director, National Accounts; Goodman; Susan Knoblauch ("Knoblauch"), Senior Manager, Sales; Sachdeva; Grace Shen ("Shen"), Vice-President, Marketing; and Steven Smith, Sr. Director of Sales; and

i.  **West-Ward:** Gavaris; Sam Goodman; Tareq Darwazeh, National Accounts Sr. Manager; Paul Markowitz, Director, National Accounts.

148. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

■ ██████████████████████████████

██████████████████████

■ ███ ███ ███ ███ ███ ███ ███ ███

██████████████████

■ ██████████████████████████████

████████████████████████

■ ██████████████████████████████

████████████████████████████████

■ ██████████████████████████████

████████████████████████████████

███ ███ ███ ███ ███ ███ ███ ███

████████████████████████████████

████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



149.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.   **Actavis**: Boyer; Falkin; Olafsson; Paul Reed, Senior Director of Trade & Sales development; Rober Stewart, COO;

b.   **Heritage**: Glazer;

c.   **Mylan**: Duda; Mauro; Nesta; Hal Korman, Executive Vice-President & COO; Potter; Rob O'Neill, Head of Sales;

d.   **Par**: Holden; Campanelli; Kenney;

e.   **(Par) Endo:** Scott Littlefield, Trade Director; Bumpas;

f.   **Sun**: Sachdeva; Steve Smith, Senior Director of Sales.

150.    On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  At this conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."   Also at this conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to raise prices of at least one drug (Glyburide). At this meeting were the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.  **Actavis:** Mark Blitman, Executive Director of Sales for Government Markets;

b.  **Mylan**: Jan Bell, Director, National Accounts; and

c.  **Heritage**: Sather.

151.   On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.   The meeting was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

a.  **Actavis**: Barrett; Falkin; John Fallon, Director of National Accounts; Giannone;

b.  **Heritage**: Sather; O'Mara;

c.  **Mylan**: Richard Isaac, Senior Manager, Strategic Accounts; Duda; Escoto; Nesta; Wyatt; Aigner; John Baranick, Director of Trade relations; Joseph Zenkus, Vice-President, North America Sales & Channel Strategy;

d.  **Par**: Gargiulo; Bayer; Holden; O'Connor

e.  **Sun**: Daniel Schober, Associate Vice President, Trade Sales; Scott Littlefield, National Account Executive; Smith; Knoblock; and

f.  **West-Ward:** Mark Boudreau, Executive Director of National Sales.

152.   On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts. This TSE was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

a.  **Actavis**: Boyer; David Buchen, Executive Vice-President Commercial, North America Generics & International; Clark; Ashley Delponte, Manager, Trade Marketing, Sales & Marketing; Dorsey; Falkin; Gorman; Rob Hooper, Senior Marketing Manager; Randy Hurst, Senior-Vice President & General Manager; Christina Koleto, Manager, Pricing Senior; Maureen Meehan; Director National

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accounts; Paul Reed, Senior Director, Trade Sales & Development; Richard Rogerson, Senior Director New Products, Business Analytics & Systems; Violet Saakyan, Marketing Manager; Eric Schultz, Senior Marketing Manager; Cindy Stevens, Director, National Accounts;;

b. **Heritage**: Heather Beem, National Accounts Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Edelson; Glazer; Malek; Gramuglia; O'Mara; Sather;

c. **Mayne**: Stefan Cross: President; Gloria Schmid, Director of National Accounts; Chris Schneider, Executive Vice President, Generic Product Division; Melissa Gardner, National Account Executive;

d. **Mylan**: Duda; Potter; Aigner; Mauro; Tighe; Wyatt; Michael Scouvart, Head of Marketing North America;

e. **Par**: Holden; Guillory; Gerald Burton, Vice President, National Accounts; Christine Caronna, Director, National Accounts; Kenney; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice-President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; Antonio Pera, Chief Commercial Officer;;

f. **Sun**: Knoblauch; Shen; Sachdeva; Hughes; Steven Smith ("Smith"), Senior Director of Sales; Steven Goodman; Anand Shah ("Shah"), Director, Strategic Pricing and Marketing; Jolene McGalliard, National Account Manager; and

g. **West-Ward:** Gavaris; Sam Goodman; Joel Rosenstack ("Rosenstack"), Senior Director, Marketing; Elizabeth Guerrero, Director, National Accounts; Paul

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Markowitz, Director, National Accounts; Doug Statler ("Statler"), Senior. Director, Head of Sales.

153.    On February 16-18, 2015 the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida. The speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends." The NPF was attended by the following representatives of Defendants, who were key executives for generic drug sales and pricing:

a.    **Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Jan Bell, Director of National Accounts; Mark Pittenger: Sr. Director of National Accounts; and

b.    **West-Ward:** Neal Gervais, National Account Director; Joseph Schrick, Director, National Accounts; and Mark Zampella. Director, National Accounts.

154.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

██    ██████████████████████████████

██    ████████████████████████████████████████

████████████████████

155.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    a.      **Mylan**: Potter; Rob O'Neill, Head of Sales; Mauro; Tighe;

    b.      **Par**: Altamuro; Holden;

    c.      **Sun**: Smith; Shah; and

    d.      **West-Ward:** Gavaris; Statler; Rosenstack.

156.    Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d)  the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (v) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (e) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (f) the April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida; (g) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (h) the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts.

157.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.   Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[84]

158.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to

---

[84] *See, e.g.*, State AG Complaint ¶¶ 50-52.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[85]

159.    A large number of generic drug manufacturers, including Defendants Mylan, Par, and West-Ward, are headquartered or have major offices in close proximity to one another in New Jersey and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

160.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (a) in Baltimore, Maryland in May, and (b) at the NACDS conference in August.

161.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

162.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a

---

[85] *Id.* ¶¶ 53-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

163.    Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.  Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

### G.    Defendants' Concerted Efforts to Increase Prices for Generic Doxycycline Yielded Supracompetitive Profits

164.    The Defendants recognized that the new collusive activity in the generic drug industry allowed them to increase prices and thereby reap supracompetitive profits.

165.    For example, during Actavis' October 29, 2013 earnings call, Director Sigurdur Olafsson stated: "[b]ut there's opportunities to take pricing increases, and that is what has changed since maybe 5 years ago when there wasn't an opportunity." Similarly, during Actavis' May 11, 2015 earnings call, its CEO Brenton Saunders stated:

> So let me tackle generic pricing. . . . We haven't seen much of a change despite all the fanfare and publicity around drug pricing in generics.  There are obviously a few products that go up.  But the model for generics is price decreases as more competitors come into the market.  That's just the way the business works. . . . That being said, the environment has remained pretty stable and favorable.  So we don't expect that to change short term either.

166.    In an August 28, 2015 presentation, Mayne reported that domestic "revenue uplift [was] driven by," among other products, Doxycycline.[86]  And in a September 9, 2015

---

[86] Mayne Presentation, *available at* https://www.maynepharma.com/media/1345/2015-full-year-investor-presentation.pdf.

69

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

presentation, Mayne reported that it would be able to optimize Doxycycline sales through "[f]urther product pricing improvements."[87]

167.     Hikma, West-Ward's parent, reported in 2013 that it raised its revenue guidance on generic drugs due to "exceptionally strong Doxycycline sales."[88] Hikma said in a March 2014 press release that its generic drug revenues increased by 158%, "reflecting very strong Doxycycline sales."[89] In Hikma's August 20, 2014 earnings call, Hikma's CFO stated: "I don't know how many of you have covered U.S. generic companies. But when I look at competitors, I look at the -- most companies that are either U.S. based or have a strong position in the U.S. are doing very well the last few years.  So the market forces are changing, I believe, in the market."

168.     Said Darwazah, CEO of Hikma (West-Ward's parent) told Bloomberg Business in December 2013 that West-Ward's huge increases in Doxycycline prices were justified because it was "'forced' to raise prices because its competitors raised theirs."[90] This assertion only confirms that generic drug competitors were no longer interested in competing on price.

169.     And Sun reported in 2013 that price increases earlier in the year yielded "$60-80 million (of $128 million in total revenue…) to come from [Doxycycline], with operating margins

---

[87] Mayne Presentation, *available at* https://www.maynepharma.com/media/1344/rodman-and-renshaw-investor-conference-september-2015.pdf.

[88] Hikma Press Release, *available at* http://www.hikma.com/content/dam/hikma/corporate/investors/Financial%20docs/2013%20Interim%20press%20release.pdf.downloadasset.pdf.

[89] Hikma Press Release, *available at* http://www.hikma.com/content/dam/hikma/corporate/investors/Financial%20docs/2013%20Prelim%20Press%20release.pdf.downloadasset.pdf.

[90] Bloomberg, *Surprise! Generic Drug Prices Spike*, *available by subscription at* "http://www.bloomberg.com/bw/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in the range of 50-55%."[91]  On February 13, 2014, Sun's Managing Director Dilip Shanghvi stated in an earnings call that: "We continued to enjoy the benefits of favourable pricing for certain generic products in the US."  On the same call, an analyst also noted that Sun "had some good price increases in select products after [Sun's] purchase of [the URL] portfolio."

170.    The share prices of Mylan, Hikma and Sun approximately tripled between October 2012 and mid-2015.

### H.    Factors Increasing the Market's Susceptibility to Collusion

171.    Publicly available data on the generic Doxycycline market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

### 1.   Industry Concentration

172.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  Here, Defendants control over 90% of the generic Doxycycline market. As explained above, industry consolidation and exits have led to this dominance.

173.    While the market for Doxycycline is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of

---

[91] Ujjval Jauhari, *Sun Pharma's prospects remain bright,* Business Standard (Sept. 12, 2013), *available at* http://www.business-standard.com/article/markets/sun-pharma-s-prospects-remain-bright-113091200894_1.html.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

174.    No departures from the market by manufacturers of Doxycycline can explain the price increases.

175.    Defendants have been able to maintain supracompetitive prices for Doxycycline without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Doxycycline.

176.    The magnitude of Defendants' price increases for Doxycycline distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.  But here the increases are extreme – jumping as much as 8200% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.  Barriers to Entry

177.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

178.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Doxycycline markets that make such entry time-consuming and expensive.

179.    Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

180.   Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Doxycycline markets.

181.   In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[92] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.   Demand Inelasticity

182.   Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

183.   In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to

---

[92] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

184.    Demand for Doxycycline tablets is highly inelastic because it is a unique product: Doxycycline is similarly unique in that it is used to treat a broad spectrum of bacterial infections. This common use has led to the drug being designated as "essential medicines" by the WHO. This gives Defendants significant pricing power, as well as an incentive to collude.

185.    Thus, generic Doxycycline is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.  Lack of Substitutes

186.    Other antibiotics—even other tetracycline antibiotics—are not substitutes for Doxycycline. Medical professionals consider Doxycycline a "workhorse" drug—the standard prescription for the treatment of a variety of bacterial infections, including bacterial pneumonia, acne, chlamydia, Lyme disease, cholera, and syphilis.[93]

187.    Other tetracyclines, such as chlortetracycline and oxytetracycline, are short acting antibiotics, with half-lives of between six and eight hours—meaning that half of these drugs' pharmacological benefits have been used within that period.  By contrast, Doxycycline has a half-life of 16 hours, *i.e.*, double that of either chlortetracycline or oxytetracycline.  Further, even as compared to other longer-acting tetracyclines, such as minocycline, studies have found that

---

[93] Dr. Jeremy A. Greene, *Drug Bust*, Slate (Nov. 20, 2014), http://www.slate.com/articles/business/moneybox/2014/11/generic_drug_prices_why_their_prices_are_suddenly_surging.html.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Doxycycline has resulted in fewer adverse events in patients, thereby making it the standard choice among physicians for the bacterial infections listed above.[94]

188.     In addition, branded versions of Doxycycline do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.

189.     Thus, purchasers of Doxycycline are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.  Standardized Product with High Degree of Interchangeability

190.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

191.     Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

192.     Defendants' generic Doxycycline products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

---

[94] *See* Kelly Smith & James J. Leyden, *Safety of Doxycycline and minocycline: A systematic review*, 27 Clinical Therapeutics 1329 (Sept. 2005), http://www.ncbi.nlm.nih.gov/pubmed/16291409.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

193.    Moreover, because generic Doxycycline products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[95] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.  Inter-Competitor Contacts and Communications

194.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[96]

195.    The Connecticut AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of Doxycycline Hyclate and Glyburide.

---

[95] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[96] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

196.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[97] The sheer number of companies implicated in the investigations (including many of the Defendants here with respect to Doxycycline) highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion. In addition to the guilty pleas of Glazer and Malek, there are the following.

(a)    **Actavis**: In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[98]

(b)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[99] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[100]

---

[97] State AG Complaint ¶ 7.

[98] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm

[99] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[100] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)    **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[101]

(d)    **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[102]

(e)    **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ,[103] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[104]

(f)    **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[105]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee

---

[101] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[102] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

[103] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

[104] *See supra* ¶ 26.

[105] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of any competitor) in the sale of generic prescription medications."[106] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular…digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[107]

(g)     **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[108] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[109]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or

---

[106] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[107] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[108] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[109] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[110]

(h)   **Mayne**:   On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena...seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[111]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on Doxycycline Hyclate delayed-release tablets (generic) and potassium chloride powders."[112]

(i)   **Mylan**:   In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to...generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to...certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[113] On November 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the

---

[110] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

[111] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

[112] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

[113] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[114]

> (j)     **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and Doxycycline.[115]   In November 2015, Endo, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic Doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[116] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including  Doxycycline  Hyclate,  Amitriptyline  Hydrochloride,  Doxazosin  Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[117]   Notably, the inquiry appears to focus on at

---

[114] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm

[115] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[116] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

[117] *Id.* at 31.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

least three products (Doxycycline, doxazosin mesylate, and methotrexate sodium) that were manufactured acquired by Par via its acquisition of DAVA.

(k)     **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[118]

(l)     **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[119]

(m)     **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[120]

(n)     **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic

---

[118] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[119] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

[120] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[121]

(o)    **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[122]

(p)    **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[123]

(q)    **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[124]

## X.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

197.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and

---

[121] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf

[122] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm

[123] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

[124] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos,* The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms

83

subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Doxycycline.

198.   In the case of Heritage, Mayne, Glazer and Malek, specifically, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

199.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Doxycycline.

200.   Plaintiffs are purchasers who indirectly purchased generic Doxycycline manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

201.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a)   Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[125]

(b)   Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including

---

[125] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

discounts or rebates), production, customers or markets without a lawful reason."[126]

(c)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[127]

(d)     Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[128]

(e)     Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[129]

(f)     Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."[130]

202.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

203.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

---

[126] Mayne Pharma Group Business Code of Conduct, *available at* https://www.maynepharma.com/media/1786/business-code-of-conduct.pdf

[127] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf

[128] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[129] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct

[130] Hikma Code of Conduct, *available at* http://www.hikma.com/en/sustainability/Code-of-conduct.html

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### B.      Fraudulent Concealment Tolled the Statutes of Limitations

204.     In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Doxycycline.

205.     In the case of Heritage, Mayne, Glazer and Malek, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

206.     No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Doxycycline.

207.     As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Doxycycline. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Doxycycline. Defendants' false statements and conduct concerning the prices of generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Doxycycline at prices established by a free and fair market.

### 1.  Active Concealment of the Conspiracy

208.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

209.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Doxycycline.

210.    For example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

211.    Paragraphs 119-27 of the AG Complaint provides specific examples of these acts of fraudulent concealment with respect to Heritage, Mayne, Malek, and Glazer, including: (a) Glazer reminding Malek on June 26, 2014 not to put evidence of his illegal conduct in writing; (b) Heritage being instructed by a competitor not to communicate through e-mail but to instead communicate by telephone; (c) Malek sending a text message about how to avoid detection by

regulators, a text message that  was not produced by Heritage in response to a subpoena by the Connecticut AG; (d) deletion of e-mails and text messages by Glazer, Malek, and other employees of Heritage regarding illegal communications with competitors; and (e) one of Mayne's key executives who participated in the conspiracy deleting several of the most incriminating text messages from her cellular telephone before the data on that telephone were imaged and produced to the Connecticut AG's office.

212.    As Jepsen said in the press release referenced above that was issued at the time that the AG Complaint was filed:  "[t]he states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation."[131]

213.    The Defendants also gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products like … Doxycycline…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

214.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Doxycycline to inflated, supracompetitive levels.

215.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull

---

[131] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Doxycycline.

216.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[132]

### 2. Plaintiffs Exercised Reasonable Diligence

217.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

218.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

219.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful

---

[132] State AG Complaint ¶ 13.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

220. For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.   CONTINUING VIOLATIONS

221. This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.   DEFENDANTS' ANTITRUST VIOLATIONS

222. During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Doxycycline sold in the United States.

223. In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Doxycycline sold in the United States. These activities included the following:

(a)   Defendants participated in meetings and/or conversations regarding the price of generic Doxycycline in the United States;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Doxycycline sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Doxycycline; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

224.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

225.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Doxycycline at inflated and supracompetitive prices.

226.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

227.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Doxycycline than they would have paid in a competitive market.

228.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Doxycycline.

229.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Doxycycline has been artificially restrained;

(b)    prices for generic Doxycycline sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    end-payer purchasers of generic Doxycycline sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Doxycycline.

## XIII.    CLASS ACTION ALLEGATIONS

230.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Doxycycline products (regular release capsules   (50 or 100mg) or tablets (100mg) or delayed release tablets (75, 100, and 150mg)), other than for resale, from November 1, 2012 through the present.

> This class excludes:   (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Doxycycline products were paid in part by a third party payer and whose co-payment was the same

regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

231.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[133] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Doxycycline products (regular release capsules (50 or 100mg) or tablets (100mg) or delayed release tablets (75, 100, and 150mg)), other than for resale, from November 1, 2012 through the present. .

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Doxycycline products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

232.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

233.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

---

[133] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

234.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Doxycycline and/or engaged in market allocation for generic Doxycycline sold in the United States;

(b)     The identity of the participants of the conspiracy;

(c)     The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the conspiracy on the prices of generic Doxycycline sold in the United States during the Class Period;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(i)      Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Doxycycline, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)      The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)      The appropriate class-wide measure of damages for the Damages Class.

235.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Doxycycline purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

236.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

237.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

238.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

239.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.    CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

240.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

241.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

242.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Doxycycline, thereby creating anticompetitive effects.

243.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Doxycycline.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

244.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Doxycycline have been harmed by being forced to pay inflated, supracompetitive prices for generic Doxycycline.

245.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

246.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Doxycycline has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Doxycycline provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

247.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Doxycycline purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

248.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

249.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[134]
### (on behalf of Plaintiffs and the Damages Class)

250.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

251.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

252.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Doxycycline and to allocate customers for generic Doxycycline in the United States.

253.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Doxycycline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Doxycycline provided in the United States; and (b)

---

[134] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

254.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Doxycycline.

255.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

256.    [INTENTIONALLY LEFT BLANK]

**Arizona**

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

258.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Doxycycline at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Doxycycline. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Doxycycline. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Doxycycline has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Doxycycline provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the

Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

258(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Doxycycline was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

**District of Columbia**

259. Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Doxycycline price competition was

restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Doxycycline, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

**Hawaii**

260.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

262.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

263.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Doxycycline, increasing the prices of generic Doxycycline, preventing competition in the sale of generic Doxycycline, or binding themselves not to sell generic Doxycycline, in a manner that established the price of generic Doxycycline and precluded free and unrestricted competition among themselves in the sale of generic Doxycycline, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

264.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Maryland**

264(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline.  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

265. Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Doxycycline prices were raised,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

266.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

**Mississippi**

267.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

268.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

269.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

270.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

271.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

272.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

111

supracompetitive, artificially inflated prices for generic Doxycycline that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

273.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

274.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

275.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

276.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

**South Dakota**

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

278.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

**Utah**

279.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

**Vermont**

280.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

281.     Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout West

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Virginia; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

282.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

283.   Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

284.   In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

285.   Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[135]
### (on behalf of Plaintiffs and the Damages Class)

286.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

287.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

288.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class

---

[135] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the

Class Period, Defendants' illegal conduct substantially affected Alaska commerce and

consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured and are threatened with further injury.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the

Damages Class seek all relief available under that statute.

**Arkansas**

289.   Defendants have knowingly entered into an unlawful agreement in restraint of

trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly

agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling,

and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic

Doxycycline were sold, distributed, or obtained in Arkansas and took efforts to conceal their

agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on

the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in

violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the

following effects: (1) generic Doxycycline price competition was restrained, suppressed, and

eliminated throughout Arkansas; (2) generic Doxycycline prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline.

During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

290.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Doxycycline in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Doxycycline in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Doxycycline. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

291.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

292.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

293.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Doxycycline were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Doxycycline because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Doxycycline, including their illegal conspiracy to secretly fix the price of generic Doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Doxycycline. Defendants' unlawful conduct had the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

294.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

295.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was

caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

296.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Massachusetts**

297. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

298.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

299.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly,

Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

300.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic Doxycycline for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Doxycycline in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Doxycycline by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Doxycycline at prices established by a free and fair market. Defendants' unlawful conduct had

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

301.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

302.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

303.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

304.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Jersey**

305.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

306.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Doxycycline were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Doxycycline as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Doxycycline because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Doxycycline, including their illegal conspiracy to secretly fix the price of generic Doxycycline at supracompetitive levels and overcharge consumers, was substantively

unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Doxycycline. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

307.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed or obtained in New York and took efforts to conceal their agreements from

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Doxycycline that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Doxycycline; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Doxycycline were misled to believe that they were paying a fair price for generic Doxycycline or the price increases for generic Doxycycline were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Doxycycline would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Doxycycline would have a broad impact, causing consumer class members who indirectly purchased generic Doxycycline to be injured by paying more for generic Doxycycline than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Doxycycline in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

308.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Doxycycline created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Doxycycline in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

309.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

310.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Doxycycline for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

311.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct,

146

Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

312.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use

or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

313.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.*   Members of the Damages Class purchased generic Doxycycline for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

314.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by

affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

315.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.  Members of the Damages Class purchased generic Doxycycline to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

316.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

317.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair.

153

Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

318.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact,

act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Doxycycline. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[136]
### (on behalf of Plaintiffs and the Damages Class)

319.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

320.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

321.    Defendants have unlawfully benefited from their sales of Doxycycline because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline at prices that were more than they would have been but for Defendants' unlawful actions.

322.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

323.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

324.    Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline while Plaintiffs and the Damages Class have been impoverished by the

---

[136] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharges they paid for Doxycycline imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

325.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

326.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

327.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Doxycycline.

328.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Doxycycline are ascertainable by review of sales records.

329.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Doxycycline.

330.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Doxycycline, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

331.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Doxycycline is a direct and proximate result of Defendants' unlawful practices.

332.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

333.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Doxycycline derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

334.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

335.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Doxycycline.

336.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Doxycycline by Plaintiffs and the Damages Class.

337.    Plaintiffs and the Damages Class have no adequate remedy at law.

338.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of

Doxycycline and forcing them to pay higher prices for Doxycycline, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Doxycycline.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

340.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arizona**

341.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline. Plaintiffs and the Damages Class have been impoverished by the overcharges for Doxycycline resulting from Defendants' unlawful conduct.    Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

342.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

343.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in California at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

### Colorado

344.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Connecticut

345.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Delaware**

346.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Doxycycline resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

347.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

348.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Florida at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

349.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

350.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Idaho**

351.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

352.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

353.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline, which revenue resulted from anticompetitive prices paid by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Kansas

354.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Kentucky

355.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Louisiana**

356.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Doxycycline resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

357.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Maine at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

358.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Maryland at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Massachusetts

359.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Michigan

360.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

361.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

362.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Doxycycline, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

363.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Missouri at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

### Montana

364.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Nebraska

365.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nevada**

366. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Nevada at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Doxycycline. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

367. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

368. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by

170

unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Doxycycline. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### New Mexico

369. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Doxycycline. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

### New York

370. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**North Carolina**

371.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

372.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Doxycycline resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

373.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

374.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

375.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

376.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Doxycycline resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

377.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### South Carolina

378.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### South Dakota

379.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Tennessee**

380.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Doxycycline.  It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Doxycycline directly from any Defendant.

**Texas**

381.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by

176

Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Doxycycline.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

382.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

383.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

384.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Virginia at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Doxycycline.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

### Washington

385.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### West Virginia

386.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

387.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

388.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**U.S. Virgin Islands**

389.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Doxycycline in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Doxycycline, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

9.     Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

### XVI.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

April 1, 2019                                        Respectfully submitted,

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire            Michael M. Buchman, Esquire
Labaton Sucharow LLP                    Motley Rice LLC
140 Broadway                            600 Third Avenue, Suite 2101
New York, NY  10005                     New York, NY  10016
(212) 907-0700                          (212) 577-0040
gasciolla@labaton.com                   mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire          James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP  The Dugan Law Firm, APLC
275 Battery Street, 29th Floor          365 Canal Street, Suite 1000
San Francisco, CA  94111-3339           New Orleans, LA 70130
(415) 956-1000                          (504) 648-0180
ecabraser@lchb.com                      jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire             Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP   Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320     1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326               Philadelphia, PA  19103
(886) 849-7545                          (267) 314-7980
jgoldstein@sfmslaw.com                  mreuben@litedepalma.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

**End-Payer Plaintiffs' Steering Committee**

Audrey A. Browne, Esquire
American Federation of State, County and
    Municipal Employees District Council 37
    Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American Federation
of State, County and Municipal Employees
District Council 37 Health & Security Plan**

Terry Gross, Esquire
Gross & Belsky, P.C.
201 Spear Street, Suite 1100
San Francisco, CA 94105
(415) 544-0200
terry@grossbelsky.com

**Attorneys for Plaintiff Valerie Velardi**

Jeffrey B. Gittleman, Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600
jgittleman@barrack.com

Frank R. Schirripa, Esquire
Hach Rose Schirripa & Cheverie LLP
185 Madison Avenue, 14th Floor
New York, NY 10016
(212) 213-8311
fschirripa@hrsclaw.com

**Additional End-Payer Plaintiffs' Counsel**

Cadio Zirpoli, Esquire

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA 94111
(415) 217-6810
cadio@saveri.com

E. Kirk Wood, Esquire
Wood Law Firm, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
205-612-0243
ekirkwood1@bellsouth.net

**Attorneys for Plaintiff Valerie Velardi
and Ottis McCrary**

**Attorney for Plaintiff Ottis McCrary**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing End-Payer Plaintiffs'

Consolidated Second Amended Class Action Complaint was filed with the Clerk of Court who

will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing

will be served on all interested parties registered for electronic filing and be available for

viewing and downloading from the Court's ECF system.


Roberta D. Liebenberg